**Anthony DOBBIN, Petitioner,**

v.

**Charles GREINER, Superintendent, Green Haven Correctional Facility, and Eliot L. Spitzer, New York State Attorney General, Respondents.**

**No. 00V7085(RMB)(DFE).**

United States District Court, S.D. New York.

Dec. 30, 2002.

Martin Lucente, Legal Aid Society, New York, for plaintiff.

Michael Keane, Attorney General, New York, for Defendant.

## ORDER

BERMAN, District Judge.

### I. Introduction

On or about September 20, 2000, Petitioner Anthony Dobbin ("Dobbin" or "Petitioner") filed a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254 ("Petition") challenging his February 28, 1996 conviction in Supreme Court, New York County, for robbery and criminal possession of stolen property in violation of N.Y. Penal Law §§ 160.15(3), 160.10(1), 160.05, 155.40. Petitioner's conviction had been affirmed on October 12, 1999 by the Appellate Division, First Judicial Department. *People v. Dobbin,* 265 A.D.2d 193, 697 N.Y.S.2d 10 (1st Dep't 1999) (finding, *inter alia,* that "[t]he court sufficiently followed the protocols required by *Batson v. Kentucky* "). Leave to appeal was denied by the New York Court of Appeals on December 30, 1999. *People v. Dobbin,* 94 N.Y.2d 861, 704 N.Y.S.2d 537, 725 N.E.2d 1099 (1999).

In his Petition, Dobbin alleges, among other things, that: (1) the trial court improperly excluded a potential juror over Petitioner's *Batson* objection; (2) he was denied effective assistance of counsel because his trial counsel incorrectly calculated his maximum sentencing "exposure"; (3) the trial court's refusal to permit the testimony of a defense witness denied him a fair trial; and (4) the trial judge gave a photograph of the victim to the jury during its deliberations without first consulting trial counsel. Respondent opposed the Petition on February 23, 2001; and Petitioner filed a reply on March 16, 2001.

On May 29, 2002, Magistrate Judge Douglas F. Eaton, to whom this matter had been referred, issued a Report and Recommendation ("Report") recommending that: (1) an evidentiary hearing be held to assess the issue of discriminatory intent with respect to Petitioner's *Batson* challenge, Report at 14; (2) an evidentiary hearing be held to determine "whether, if the parties had known the correct sentencing exposure prior to trial, Dobbin would have received and accepted a plea offer less than his eventual sentence," *id.* at 21; and (3) the trial court's preclusion of a defense witness did not rise to the level of a constitutional violation, *id.* at 16–17; (4) Petitioner's claim regarding the victim's photo "lacks substance." *Id.* at 22.[1]

The Report advised the parties that "[p]ursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, any party may object to this recommendation within 10 business days after being served with a copy." *Id.* at 22. Petitioner filed objections to the Report, dated June 24, 2002 ("Petitioner's Objections"). On June 24, 2002, Respondent

---

1. This (fourth) recommendation is not objected to here.

filed objections to the Report ("Respondents' Objections"); and on June 28, 2002, Petitioner filed a response to Respondent's Objections ("Petitioner's Response"). **For the reasons set forth below, the Report is adopted in all respects.**

## II. Standard of Review

The Court may adopt those portions of a Magistrate's report to which no objections have been made and which are not facially erroneous. *See* Fed.R.Civ.P. 72(b); *see, e.g., Letizia v. Walker,* No. 97 Civ. 0333, 1998 WL 567840, at *1 (W.D.N.Y. Aug. 27, 1998); *Pizarro v. Bartlett,* 776 F.Supp. 815, 817 (S.D.N.Y.1991); *Nelson v. Smith,* 618 F.Supp. 1186, 1189 (S.D.N.Y.1985). The court conducts a *de novo* review of those portions of a Magistrate's report to which objections have been made. *See, e.g., Letizia,* 1998 WL 567840 at *1; *Pizarro,* 776 F.Supp. at 817. Once objections are received, a district judge may accept, reject, or modify, in whole or in part, the findings and recommendations of the Magistrate. *See, e.g., DeLuca v. Lord,* 858 F.Supp. 1330, 1345 (S.D.N.Y.1994); *Walker v. Hood,* 679 F.Supp. 372, 374 (S.D.N.Y. 1988).

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), codified at 28 U.S.C. § 2254(d) (2000), "[a]n application for a writ of habeas corpus ... shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—(1) resulted in a decision that was contrary to, or involved an unreasonable application of,

clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." And, "the federal courts 'must give the state court's adjudication a high degree of deference.'" *Dickens v. Filion,* 2002 WL 31477701, at *7 (S.D.N.Y. Nov.6, 2002) (quoting *Yung v. Walker,* 296 F.3d 129, 134 (2d Cir.2002)).

## III. Analysis

The facts as set forth in the Report are incorporated herein unless otherwise noted.

The Court has conducted a *de novo* review of the record herein, including, among other things, the Report, both parties' Objections, Petitioner's Response, and applicable legal authorities, and concludes that Magistrate Eaton's legal and factual determinations are supported by the record and the law in all material respects. Neither parties' submissions provide a basis for departing from the Report's recommendations.[2]

### *The Batson Claim*

Magistrate Eaton determined that by failing to conduct a meaningful "stage three" inquiry into whether the prosecutor's proffered race-neutral reason for its peremptory challenge was pretextual, Report at 12, the trial court judge, the Honorable Charles J. Tejada, "did not sufficiently follow the protocols required by *Batson*."[3] *Id.* at 13; *see Jordan v. Le-*

---

**2.** As to any portions of the Report to which no objections have been made, the Court concludes that the Report is not clearly erroneous. *See Pizarro,* 776 F.Supp. at 817. Any objections which are not specifically discussed in this Order have been considered and rejected.

**3.** Magistrate Eaton also concluded that the Appellate Division's finding that Justice Tejada "sufficiently followed the protocols of *Batson v. Kentucky*," *see People v. Dobbin,* 265 A.D.2d 193, 697 N.Y.S.2d 10, "was an unreasonable application of clearly established Federal law, as determined by the Supreme Court in *Batson*." Report at 12.

*fevre,* 206 F.3d 196, 201 (2d Cir.2000), *re-manded to* 2000 WL 1877039 (S.D.N.Y. Dec.27, 2000), *aff'd* 293 F.3d 587 (2d Cir. 2002) (trial judge's "cursory treatment" of *Batson* application "was not a meaningful inquiry into 'the decisive question ... whether counsel's race neutral explanation for a peremptory challenge should be believed' ") (quoting *Hernandez v. New York,* 500 U.S. 352, 365, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991)). Respondent argues that Justice Tejada (sufficiently) "heard defense counsel's argument as to why the prosecutor's proffered explanation should be deemed pretextual" and "plainly considered counsel's argument." Respondents' Objections at 4.

A proffered reason for a challenged peremptory strike need not be "persuasive, or even plausible." Respondents' Objections at 7 (quoting *Purkett v. Elem,* 514 U.S. 765, 768, 115 S.Ct. 1769, 131 L.Ed.2d 834 (1995)). At the same time, the United States Court of Appeals for the Second Circuit has "emphasized a trial court's duty at the third stage to determine the credibility of the proffered explanations." *Jordan,* 206 F.3d at 200 (citing *Barnes,* 202 F.3d 150).[4] Justice Tejada clearly heard the prosecutor's race-neutral explanation—which, presumably, was that the challenged juror, a Department of Corrections employee, might have contact with the Petitioner—and summarily determined that this reason was sufficient to strike the juror. 2/21/96 Hearing Transcript at 82–83. When defense counsel argued that the prosecutor's explanation was "all specula-

tion" and sought to "complete the record," *id.,* Justice Tejada "gave the impression that the claim of racial discrimination was refuted as soon as the prosecutor gave a reason unrelated to race, and that there was no need to argue about whether the reason was credible." Report at 12; 2/21/96 Hearing Transcript at 82–83 ("Counsel [the prosecutor], you don't have to respond. What the law requires the People to give is a reason unrelated to race. They have done it.").

■ Without in any way critiquing the prosecutor's race neutral explanation, or suggesting a different outcome, the Court agrees with Magistrate Eaton that the trial judge should have allowed defense counsel (more) time to make his case. Where a trial court "granted counsel no time to identify the relevant facts and assess the circumstances necessary to decide whether the race neutral reasons given were credible and nonpretextual," an evidentiary hearing may serve the purpose of completing the record. *See Jordan,* 206 F.3d at 200–01.

### *Ineffective Assistance of Counsel Claim*

Prior to March 21, 1996, defense counsel (as well as the prosecutor) mistakenly believed that Petitioner, if convicted, would be classified as a "mandatory persistent violent felony offender" because of Petitioner's prior convictions for (i) attempted robbery in the second degree, and (ii) attempted criminal possession of a weapon (a knife) in the third degree. They did not

---

4. When a *Batson* challenge is raised, a trial court must decide: "(1) whether the [movant] has made a prima facie showing that the [non-movant] has exercised its peremptory strike on the basis of race, (2) if so, whether the [non-movant] has satisfied its burden of coming forward with a race-neutral explanation for striking the juror in question, and (3) if so, whether the [movant] has carried his burden of persuasion of proving purposeful

discrimination." *Barnes v. Anderson,* 202 F.3d 150, 155 (2d Cir.1999) (brackets in original). "Only at the third step of the analysis does the persuasiveness of the non-movant's race-neutral explanation become relevant ... The third-stage analysis thus compels courts to determine 'the credibility of the proffered explanations.' " *Id.* at 156 (quoting *United States v. Alvarado,* 923 F.2d 253, 256 (2d Cir.1991)).

realize that Petitioner's second conviction did **not** subject him to mandatory persistent violent felony offender status under New York Penal Law §§ 70.04 and 70.08. Report at 17. By the time of Petitioner's sentencing on April 17, 1996, defense counsel was aware of the mistake and provided proof that Petitioner's second prior conviction was not a "violent offense" (within the meaning of N.Y. Penal Law § 70.02(1)(d)) and apprised Justice Tejada that Petitioner's correct status was that of a second violent offender—not a persistent violent felony offender. Affirmation in Response to Defendant's *Pro Se* Motion to Vacate Judgment Pursuant to Criminal Procedure Law Section 440.10, dated April 5, 1999, at 3; 4/17/96 Sentencing Transcript at 3–5, 7.[5]

■ Magistrate Eaton recommends (appropriately in these circumstances) that an evidentiary hearing be held to determine "whether, if the parties had known [Petitioner's] correct sentencing exposure prior to trial, Dobbin would have received and accepted a plea offer less than his eventual sentence of 12 to 24 years." Report at 21.

"To establish a claim of ineffective assistance of counsel, a convicted defendant must show that (1) his counsel's performance fell below an objective standard of reasonableness; and (2) but for the deficiency, there is a reasonable probability that the outcome of the proceeding would have been different." *U.S. v. De La Pava*, 268 F.3d 157, 163 (2d Cir.2001) (citing *Strickland v. Washington*, 466 U.S. 668, 687–96, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)). Faced with facts similar to those at bar, the Court in *Mask v. McGinnis* determined that "defense counsel's representation fell below the prevailing norm by virtue of his failure to recognize defendant's status as a second violent felony offender rather than a persistent violent felony offender." 28 F.Supp.2d 122, 125 (S.D.N.Y.1998) (Chin, J.), *aff'd*, 233 F.3d 132 (2d Cir.2000). *See also United States v. Gordon*, 156 F.3d 376, 380 (2d Cir.1998) (defense counsel's legal assistance "fell below an objective standard of reasonableness" by underestimating petitioner's sentencing exposure); *Jamison v. Senkowski*, 2001 WL 246397 (S.D.N.Y. Mar.13, 2001).

To establish prejudice as a result of counsel's error, a "petitioner must demonstrate a reasonable probability that, if defense counsel had realized his mistake, not only would the district attorney have offered a more lenient plea offer, but petitioner would have accepted it as well." *Mask*, 28 F.Supp.2d at 125; *see also Gordon*, 156 F.3d at 380–81.[6]

Respondent argues, among other things, that "there was no reasonable probability

---

5. On November 8, 1995, the prosecutor had indicated Petitioner's recommended sentence would be ten to twenty years in prison. (Then) New York State Supreme Court Justice Richard T. Andrias informed the prosecutor that, in his view, Petitioner was a mandatory persistent violent offender and that the minimum sentence was ten years to life in prison. On January 25, 1996, the prosecutor offered Petitioner a plea of attempted robbery in the first degree with a sentence of eight years to life. This offer was rejected by Petitioner. Report at 18.

6. In *Mask*, the court determined that a reasonable probability existed "that if defense counsel had pointed out that petitioner was not a persistent violent felony offender, additional negotiations would have been pursued and the prosecutor probably would have been willing to offer" a lower sentence. *Mask*, 28 F.Supp.2d at 126. This determination was based upon the *Mask* petitioner's affidavit which stated that he would have pled guilty to a lesser sentence than the ten years to life term offered, **as well as** the prosecutor's comments on the record which "suggest[ed] that the prosecutor would have been willing to offer a lesser sentence if the law permitted." *Id.*

that the prosecutor would have made [P]etitioner a more favorable offer." Respondents' Objections at 15–16. Respondent contends that "the People only made an offer to a reduced charge **after** the prosecutor came under the mistaken assumption that petitioner would qualify for mandatory persistent treatment." *Id.* at 16 (emphasis in original).

Magistrate Eaton's recommendation that an evidentiary hearing be held provides appropriate additional fact gathering "process" in this situation. Report at 21; *see, e.g., Mask*, 28 F.Supp.2d at 126; *Gordon*, 156 F.3d at 381.[7]

### The Precluded Witness

Magistrate Eaton concluded that the trial court's preclusion of a defense witness, Ray Agnew, was error, but also believed that this ruling "did not rise to the level of a constitutional violation." Report at 17. The Magistrate determined (correctly in this Court's view) that the proposed testimony of Mr. Agnew—to establish that the complaining witness misidentified Petitioner as a result of "unconscious transference"—"would not have overcome the strong evidence that corroborated [the victim's] identification." *Id.* at 16.

█ In determining whether a limitation on the right to present witnesses rises to the level of a constitutional violation, the test is whether the omitted evidence, evaluated in the context of the entire record, "creates a reasonable doubt that did not otherwise exist. In a close case, additional evidence of relatively minor importance might be sufficient to create a reasonable doubt. On habeas review, trial errors are subject to lenient harmless error review." *Washington v. Schriver*, 255 F.3d 45, 56

(2d Cir.2001) (internal quotations and citation omitted); *Brecht v. Abrahamson*, 507 U.S. 619, 637, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993) ("[u]nder this standard, habeas petitioners may obtain plenary review of their constitutional claims, but they are not entitled to habeas relief based on trial error unless they can establish that it resulted in 'actual prejudice' ").

█ This does not appear to have been a "close case." Magistrate Eaton correctly determined that the testimony excluded would not have created reasonable doubt in light of the compelling evidence that supported the victim's identification. Report at 16. Among other things, (i) the bruises and swelling over Petitioner's eye corroborated the victim's testimony that he struck Petitioner with his beeper near his eye during a struggle, 2/22/96 Trial Transcript at 50–54; (ii) Petitioner identified as his own a broken wristwatch found at the scene of the robbery, *id.* at 47–48; (iii) Petitioner (and no one else in the vicinity) matched the description of the perpetrator, as testified to by the arresting officer, which included (Petitioner's) attire of a blue and white striped shirt, blue jeans, and white tennis shoes, *id.* at 20–22; and (iv) the victim identified Petitioner in a "show up" shortly after the robbery. *Id.* at 204–07.

## IV. Conclusion

For the reasons stated herein and therein, the Report [14] is adopted in its entirety. The matter is returned to Magistrate Eaton for the purpose of conducting evidentiary hearing(s) forthwith to determine: (1) the issue of discriminatory intent re

---

**7.** Petitioner indicated in his C.P.L. § 440.10 motion that, had he been offered a lower sentence, he would have considered it. *See* Affidavit in support of Motion to Vacate the Judgment Pursuant to CPL 440.10(h) and Per

mission to Proceed as a Poor Person, dated March 1, 1999, at 3; Affirmation in Support of C.P.L. § 440 Motion to Vacate Judgment, dated April 4, 1999, at 6.

garding the prosecutor's peremptory challenge; and (2) whether Petitioner would have been offered and accepted a lesser sentence than the sentence actually imposed. Magistrate Eaton is respectfully requested to issue a further Report and Recommendation following the evidentiary hearings.

## REPORT AND RECOMMENDATION
## TO JUDGE BERMAN

EATON, United States Magistrate Judge.

In this habeas petition, Anthony Dobbin challenges his conviction after a 1996 jury trial before Justice Charles J. Tejada in Supreme Court, New York County. Dobbin was convicted of robbing the same person on two separate dates. At trial, Dobbin was represented by Daniel Parker. On appeal, and in this habeas proceeding, he is represented by Martin M. Lucente of The Legal Aid Society's Criminal Appeals Bureau.

On September 20, 2000, Mr. Lucente filed the petition, a memorandum of law, and an appendix in two parts ("App."). On February 23, 2001, Assistant Attorney General Michael J. Keane served and filed an opposing memorandum of law, and provided the full transcript of the jury selection and the trial. Mr. Lucente served and filed a reply memorandum on March 16, 2001. A year later, on March 18, 2002, Dobbin filed a *pro se* supplemental brief. I will treat it as a timely amendment adding a Ground "Four" to the petition; Dobbin sought permission to file such a brief in a letter to Judge Berman dated October 17, 2000, although I did not grant permission until March 8, 2002.

### Summary of My Recommendations

Ground One is a *Batson* claim; Dobbin's trial attorney objected when the prosecutor exercised a peremptory challenge against the only remaining prospective juror who was black. Justice Tejada overruled the objection, but he cut off a defense attempt to make a complete record on the issue of discriminatory intent. I recommend that Judge Berman direct that he or I hold a hearing to determine that issue.

Ground Two is a *Chambers* claim; Justice Tejada refused to allow a defense witness to testify that Dobbin was employed on the same block where the victim was employed. I find that evidentiary ruling to be erroneous but it did not rise to the level of a constitutional violation, in view of the fairly strong evidence against Dobbin.

Ground Three is a *Strickland* claim; it charges the trial attorney with ineffective assistance for failing to realize that Dobbin's prior record did not make him eligible for a life sentence. I recommend that Judge Berman direct that he or I hold a hearing to determine whether, if the parties had known the correct sentencing exposure prior to trial, Dobbin would have received and accepted a plea offer less than his eventual sentence of 12 to 24 years.

Ground "Four" lacks substance. During deliberation, a jury note asked for a photograph that was in evidence. Dobbin complains that the judge sent the photograph in to the jury without consulting counsel. It was a photograph of the victim, and it was relevant to the issue of whether he suffered "physical injury," an issue the jury resolved in favor of Dobbin.

### Procedural History

On July 31, 1995, a 911 caller described a black man who was robbing the attendant at an outdoor parking lot at Eighth Avenue and West 29th Street in Manhattan. The description was radioed to a police officer, who quickly arrested Dobbin two blocks north of the lot. In a street

showup, the victim Omar Leon identified Dobbin as the man who had just robbed him. Leon also claimed that, four days earlier, he was robbed in the same place by the same man and an accomplice wielding a knife.

The jury found Dobbin guilty of one robbery in the first degree (for acting in concert with the knife-wielding accomplice on July 27) and of a robbery in the third degree (the jury was unconvinced that Leon suffered a "physical injury" on July 31). On April 17, 1996, Justice Tejada imposed consecutive sentences of 9 to 18 years on the July 27 robbery and 3 to 6 years on the July 31 robbery.

The Appellate Division affirmed the conviction, *People v. Dobbin,* 265 A.D.2d 193, 697 N.Y.S.2d 10 (1st Dep't 1999), *lv. denied,* 94 N.Y.2d 861, 704 N.Y.S.2d 537, 725 N.E.2d 1099 (Ct.App.1999).

*Ground One: The Batson claim: the peremptory challenge of a black juror.*

■ Ground One is not susceptible to a harmless error analysis. "Because the effects of racial discrimination during *voir dire* 'may persist through the whole course of the trial proceedings,' we hold that a *Batson/Powers* claim is a structural error that is not subject to harmless error review." *Tankleff v. Senkowski,* 135 F.3d 235, 248 (2d Cir.1998) (citation omitted).

Dobbin's *Batson* claim relates to the prosecutor's peremptory challenge of a potential juror named Levaughn Charret.[1] It appears to be undisputed that Mr. Charret was the last remaining black person among the prospective jurors who were called to numbered seats, and that Dobbin was tried by a jury containing no black persons.

Jury selection began on February 20, 1996. (2/20 Tr. 72) Justice Tejada handed a questionnaire to the potential jurors, and questions were asked by him and then by the lawyers (Assistant District Attorney Birgit Kollmar and defense attorney Daniel Parker). By the end of the first day, two jurors had been selected. On the next day, a new group of prospective jurors was present. After several people were excused because of family, business or physical problems, sixteen prospective jurors were seated in the jury box, including Mr. Charret. At 2/21 Tr. 18–19, Justice Tejada addressed these sixteen persons as follows:

> THE COURT: The first group of questions concerning your background, the first question is the defendant, his attorney, the prosecuting attorney will be identified to you.
>
> Do any of you recognize those persons as someone you may know?
>
> It's fine for you to answer no or maybe. I'm asking for a show of hands—

No one, including Mr. Charret, indicated any recognition of Dobbin or the attorneys. On the same page, Justice Tejada asked:

> Anyone of you know anything about the case other than what I told you? Anyone close to you such as friends or relatives work as a law enforcement agent or do such work for law enforcement federal agency or [have] you or any of them done such work in the past?

Mr. Charret responded:

> JUROR [# 2, Mr. Charret]: I work for Department of Correction.
>
> THE COURT: What kind of work do you do there?

---

1. In the transcript, Mr. Charret's first and last names are spelled a number of different ways. I will refer to him as Levaughn Charret.

JUROR: [F]ood Service Division.

THE COURT: Is there anything about that fact you think would affect your ability to be a juror in this case?

JUROR: No, I don't.

No one questioned Mr. Charret further on this subject.

Mr. Charret responded to subsequent questions. At 2/20 Tr. 25, when Justice Tejada asked if anyone had been a victim of a crime, Mr. Charret reported:

JUROR: My car was broken into.

THE COURT: Anything about that fact would affect your ability to be a juror in this case?

JUROR: No.

Later the judge asked if anyone had served on a grand jury:

JUROR [Charret]: Grand jury, Criminal trial.

THE COURT: How long ago was the grand jury?

JUROR: Maybe four years ago.

THE COURT: And the criminal trial, did you reach a verdict?

JUROR: I was an alternate so I didn't deliberate.

The prospective jurors then referred to the judge's questionnaire and answered each of the questions on it. When Mr. Charret's turn came, he said:

JUROR: Levaughn Charret, age 34, Upper East Side, Harlem. I rent, I am familiar with the area, I live there. I do live in New York County, not married, single. My occupation is—I work Department of Correction, Food Service Division, 12 years education, interest is sports and fishing. No legal training. I could stay in a hotel if possible. I have no problem passing judgment and I can be fair and impartial.

2/20 Tr. 45, App. 143. It appears to be undisputed that there was only one other black person on the panel—Doris Robinson,[2] seated in number 13. She answered questions at Tr. 52, 58–62 and 75–76. At Tr. 76–79, App. 172–75, ADA Kollmar persuaded Justice Tejada to excuse Doris Robinson for cause, over defense objection.

Soon, it was time for the attorneys to exercise any peremptory challenges addressed to the ten jurors who were seated in the lowest numbered seats. ADA Kollmar challenged Mr. Charret and a Mr. Matthews. The following crucial colloquy then occurred:

MR. PARKER: I would note for the record that the People wish to challenge Mr. Charett number two, he is the only black male. He is the only black left on the panel. There were two blacks on the panel. One was Ms. Robinson. The people moved to challenge her for cause, and the Court granted that over the defendant's objection and the only remaining black on the panel is Mr. Charrett in the entire ven[ire].

People move to challenge him I would note that. I would object to that.

THE COURT: Do you mean Mr. Parker? [I think the judge probably said "What do you mean, Mr. Parker?" or "Do you mean, Mr. Parker,——"]

MR. PARKER: I mean it seems to me, the reason he was challenged, because he is a black male and the defendant is a black male. The People challenged the only black male on the panel, gave no indication, [that] he couldn't [be fair?]. Moreover he had previously been selected as an alternate in a criminal trial, he worked for Department of Corrections, food service. He says he has been the victim of a crime. His car was broken into. He said he had no

2. The transcript is not clear whether her name was Robinson or Robertson.

problem being fair and impartial to both sides.

THE COURT: All right, Ms. [Ko]ll-mar.

MS. KOLLMAR: Your Honor, with regard to Mr. C[h]arrett while he was not pursued, the fact he was employed in food service, he [we? I?] couldn't determine whether he was actually in a facility. I was going to ask the Court to pursue this. I don't know where the defendant was being detained, in case food service was actually on the premises preparing food, discussing possibilities, these two could have contact.

With regard to Ms. Robinson quite clearly the reason for challenge is not because of the fact she is a black woman.

MR. PARKER: Judge, just so it's clear, all speculation the People could have asked Mr. C[h]arrett any of those questions, where he works. They chose not to.

THE COURT: Counsel, you [the prosecutor] *don't have to respond.* What the law requires the People to *give* is *a reason unrelated to race.* They have *done it.*

MR. PARKER: I want to complete the record, why I think *they haven't done it.*

THE COURT: Could you have asked those questions too?

MR. PARKER: But I don't think that these questions in this case—well, the People didn't ask any ground to preclude, I found the juror perfectly able to be fair.

THE COURT: You make your application to challenge.

MR. PARKER: I'm not challenging. *I would like opportunity to put on the record* why I'm requesting application to do that.

MS. KOLLMAR: Your Honor, if you want to list the reason for that.

THE COURT: The reason is mutual [neutral?] and consequently—

MR. PARKER: The peremptory stands.

(2/21/96 Tr. 81–83, App. 454–56 (emphasis added).)

At Tr. 87, 18 more persons were selected at random to move from the venire seats to the numbered seats. At Tr. 99, after a lunch break, Mr. Parker noted for the record that there was now only "one prospective panel member in the jury room who is an African American." That comment was not disputed. Apparently, that person was never called from the venire seats to the numbered seats, and Dobbin wound up being tried by a jury containing no black persons.

On the direct appeal, Mr. Lucente's Point I (App.272–78) argued that ADA Kollman's proffered reason "was totally speculative, unsupported by the record, and manifestly pretextual." (App.272.) It also argued, at App. 278:

... the court failed, in ruling against the defense, to set forth reasons or findings to support its decision to allow the exercise of the prosecutor's challenge. Failing to analyze the *Batson* challenge under the recognized rules for such analysis, the court erred in dismissing the juror and violated appellant's right to equal protection.

The People's brief responded, at App. 326–27:

... after listening to the prosecutor offer a race-neutral reason for her challenge and hearing [part of] defendant's response to these reasons, the court stated that "the law requires the People to give a reason unrelated to race. They have done it." [citing 2/21/96 Tr. 82–83, now App. 455–56] Thus, although

Justice Tejada did not directly state the factual basis for his decision, it is obvious that he reached his conclusions based upon his observations of the prosecutor, his evaluation of her arguments, and his consideration of defendant's response. Recently, this Court has found that similarly "implicit" findings were sufficient to demonstrate that a court had followed its obligation to make a record of its ruling. *See People v. Wilborn*, 250 A.D.2d 549, 673 N.Y.S.2d 633 (1st Dept.1998).

The Appellate Division ruled:

> The court sufficiently followed the protocols required by *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69, and its [implicit] determination that defendant did not sustain its burden of proving purposeful racial discrimination is entitled to great deference and is supported by the totality of the record.

*People v. Dobbin*, 265 A.D.2d 193, 697 N.Y.S.2d 10 (1st Dep.1999) (citation omitted).

When Mr. Lucente applied for leave to appeal, he arguably conceded that Justice Tejada had made an implicit finding on credibility and that the Appellate Division had made it explicit. In a ten-page letter to Judge Howard A. Levine, Mr. Lucente wrote (at App. 434):

> The trial court and Appellate Division therefore both erred in ruling that the challenge was not pretextual and, in effect, crediting the prosecutor's excuse based on the nature of the juror's employment.

Judge Levine denied leave on December 30, 1999. (App.466.) Three months later, the Second Circuit issued an important decision about *Batson* claims in the habeas context, *Jordan v. Lefevre*, 206 F.3d 196 (2d Cir.2000).

Jordan had presented his Batson claim to the Appellate Division somewhat differently than Dobbin had. Jordan argued that the trial judge "improperly deprived Mr. Jordan and his codefendant their opportunity to carry their burden of persuasion at the third-step ...." (Jordan's Br. to 1st Dept., quoted in *Jordan v. Lefevre*, 22 F.Supp.2d 259, 274 (S.D.N.Y.1998) (*"Jordan I"*).) The Second Circuit ruled:

> The state trial judge presiding at Jordan's trial was not in a position to make the requisite determination as to discriminatory intent. In an effort to save "an awful lot of time" he ruled summarily on the Batson application after an extremely brief colloquy, and [then] resisted counsel's efforts to make arguments regarding the peremptory strikes so as to create a full record. The trial judge could not properly decide the third Batson step because he granted counsel no time to identify the relevant facts and assess the circumstances necessary to decide whether the race neutral reasons given were credible and nonpretextual.

*Jordan*, 206 F.3d at 201.

Earlier in that same opinion, the Second Circuit referred to a federal trial and said:

> ... we recently emphasized a trial court's duty at the third stage to determine the credibility of the proffered explanations. See *Barnes v. Anderson*, 202 F.3d 150 (2d Cir.1999). There we held it was error for the trial court to deny a Batson motion without explicitly adjudicating the credibility of the ... race neutral explanations ....

*Jordan*, 206 F.3d at 200. But the United States Supreme Court has not held that the credibility adjudication must be "explicit," and indeed it has suggested that an implicit adjudication is sufficient. *See Hernandez v. New York*, 500 U.S. 352, 357 n. 2, 111 S.Ct. 1859, 1865 n. 2, 114 L.Ed.2d

395 (1991); footnote 2 quoted the trial judge and said that he (implicitly) "appears to have accepted the prosecutor's reasoning as to his motivation." Later, the opinion stated, "The trial judge in this case chose to believe the prosecutor's race-neutral explanation," which "represents a finding of fact." 500 U.S. at 364, 111 S.Ct. at 1868. This was an opinion for four justices; two other justices also said "that the finding of no discriminatory intent was not clearly erroneous in this case." 500 U.S. at 372, 111 S.Ct. at 1873.

*Jordan*, like the case at bar, involved a habeas petition filed after the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). Hence they are governed by 28 U.S.C. § 2254(d):

> An application for a writ of habeas corpus ... shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim:
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

In June 2001, granting a pre-AEDPA habeas petition, the Second Circuit wrote:

> Our holding should not be read, however, as requiring a talismanic recitation of specific words in order to satisfy *Batson*. This may well have been a different case if the trial court's review of Galarza's *Batson* challenges culminated in a general crediting of the prosecutor's race-neutral explanations or possibly even if the trial court had merely stated

that it rejected each of Galarza's *Batson* claims.

*Galarza v. Keane,* 252 F.3d 630, 640 n. 10 (2d Cir.2001).

A bit later, the *Jordan* case, after an evidentiary hearing by Judge Mukasey, returned to a different panel of the Second Circuit. *Jordan v. Lefevre,* 293 F.3d 587 (2d Cir.2002) (sometimes known as "*Jordan IV*"). It seems to me that *Jordan IV* moved farther away from any notion that habeas can be granted on the ground that a state trial judge did not "explicitly" adjudicate the credibility of the prosecutor's explanation. True, *Jordan IV* quoted that word "explicitly," but in a "See also" cite to *Barnes v. Anderson,* 202 F.3d 150, 156–57 (2d Cir.1999), and I note that *Barnes* involved a federal trial, not a state trial. Moreover, *Jordan IV* summarized the Second Circuit's previous ruling ("*Jordan II*") as follows:

> ... the trial court had acted summarily, without permitting the defense to create a record sufficient to allow a determination of whether the prosecutor's explanations were credible and nonpretextual....
>
> We held in *Jordan II* that ... the trial court had failed to satisfy *Batson's* third step. The court had given only perfunctory consideration to Jordan's *Batson* objection, summarily rejecting it without conducting "a meaningful inquiry ...."

*Jordan IV,* 293 F.3d at 589–91.

In the case at bar, the briefs addressed to me were written after *Jordan II* and before *Jordan IV*. Mr. Lucente's 3/15/01 Reply Mem., at p. 3, cites *Jordan II* and complains that "the trial court failed to make any explicit adjudication as to the credibility." This complaint is accurate. However, the United States Supreme Court has not held that the credibility adjudication must be "explicit." Hence, I

think our Court does not have power to grant habeas on the ground that a state trial judge did not make an "explicit" ruling on the credibility of the prosecutor's explanation. Accordingly, I think Mr. Lucente did not weaken his case when he essentially conceded to Judge Levine that there had been an implicit ruling crediting ADA Kollman's excuse. (App.434.)

On the other hand, Mr. Lucente's *Batson* claim contains another point about *Batson's* procedural requirements, and I believe that he preserved it and exhausted it, even though he did not make it as clearly as Jordan did. As mentioned above, Jordan argued that the trial judge "improperly deprived Mr. Jordan and his codefendant their opportunity to carry their burden of persuasion at the third-step . . . ." (Jordan's Br. to 1st Dept., quoted in *Jordan I,* 22 F.Supp.2d at 274.) Mr. Lucente did not use those words. But his brief to the Appellate Division did say:

> . . . While the ultimate burden of persuasion as to the discriminatory nature of the challenge rests with the party opposing it, the court . . . bears the overall "responsibility to make a sufficient record to allow for meaningful appellate review." The court below failed to apply these rules correctly . . . .

> \*      \*      \*      \*      \*      \*

> While the court therefore erred in allowing the prosecutor to exercise this peremptory challenge, it violated not only the substance of the *Batson* doctrine but the procedure of the challenge process as well. Its suggestion to defense counsel . . . effectively pre-empted any meaningful stage three inquiry. . . . Failing to analyze the *Batson* challenge under the recognized rules for such analysis, the court erred in dismissing the juror and violated appellant's right to equal protection.

(App. 274, 277–78, citation omitted.) The Appellate Division responded: "The court sufficiently followed the protocols required by *Batson v. Kentucky,* . . . ." (265 A.D.2d 193, 697 N.Y.S.2d at 11.)

I respectfully disagree with the Appellate Division. This was an unreasonable application of clearly established Federal law, as determined by the Supreme Court in *Batson.* Mr. Charret indicated that he did not recognize defendant Dobbin. (2/21 Tr. 18–19.) Yet ADA Kollmar asserted that "these two could have had contact" because Mr. Charret was employed in the Food Service Division of the Department of Correction and Dobbin was one of thousands detained in the City jails. It is hard to see why any such contact might make Mr. Charret sympathetic to Dobbin. Moreover, as defense attorney Parker pointed out, ADA Kollmar's premise was "all speculation." At this point (App.455–56), Justice Tejada's words gave the impression that the claim of racial discrimination was refuted as soon as the prosecutor gave a reason unrelated to race, and that there was no need to argue about whether the reason was credible:

> THE COURT: Counsel, you [the prosecutor] don't have to respond. What the law requires the People to give is a reason unrelated to race. They have done it.

The defense attorney then twice said that he wanted to complete the record on this issue, and ADA Kollmar even offered to "list the reason" why she had not put questions to Mr. Charret. But Justice Tejada cut off both attorneys, and stated "The reason is mutual," which I read as a statement that ADA Kollmar's reason was "neutral," in other words, race-neutral. (App.456.) I agree with Mr. Lucente that Justice Tejada "effectively preempted any

meaningful stage three inquiry." (App. 277, Br. to 1st Dept. at p. 30.)

The Appellate Division ruled:

The court sufficiently followed the protocols required by *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69, and its [implicit] determination that defendant did not sustain its burden of proving purposeful racial discrimination is entitled to great deference and is supported by the totality of the record . . . .

I am willing to accept that Justice Tejada's statements amounted to an implicit determination that defendant did not sustain his burden of proving racial discrimination. An implied finding of fact is entitled to a presumption of correctness in a habeas proceeding. *Marshall v. Lonberger,* 459 U.S. 422, 433–34, 103 S.Ct. 843, 850–51, 74 L.Ed.2d 646 (1983); *Ventura v. Meachum,* 957 F.2d 1048, 1055 (2d Cir.1992). But the record shows, by clear and convincing evidence, that Justice Tejada did not sufficiently follow the protocols required by *Batson.* Accordingly, Dobbin has rebutted, by clear and convincing evidence, the presumption of correctness set forth in 28 U.S.C. § 2254(e)(1).

Dobbin's *Batson* claim is on all fours with *Jordan II,* which also involved a post-AEDPA petition and included the following pertinent analysis:

. . . When counsel objected that "the record is not complete" the judge [in *Jordan* ] replied "do it very succinctly, because I'm not going to be spending more time in here listening to you." . . .

\* \* \* \* \* \*

. . . [T]he *Batson* analysis recognizes that a race neutral reason may be rational and yet be a pretext for discrimination. *See Hernandez,* 500 U.S. at 363, 111 S.Ct. 1859 [at 1868].

Jordan now declares that the district court's conclusory statement that the prosecutor's explanations were race neutral did not satisfy *Batson* 's third step. We agree. . . .

\* \* \* \* \* \*

The state trial judge presiding at Jordan's trial was not in a position to make the requisite determination as to discriminatory intent. In an effort to save "an awful lot of time" he ruled summarily on the *Batson* application after an extremely brief colloquy, and resisted counsel's efforts to make arguments regarding the peremptory strikes so as to create a full record. . . . This cursory treatment of Jordan's *Batson* application was not a meaningful inquiry . . . .

. . . [T]he limited record developed in the present case casts doubt on the trial court's ability to make the required finding regarding the prosecutor's intent, thereby undermining the deference due its conclusion.

*Jordan II,* 206 F.3d at 199–201.

Accordingly, I recommend that Judge Berman direct that he or I hold an evidentiary hearing to determine whether ADA Kollmar had a racially discriminatory intent when she struck the prospective juror.

*Ground Two: The Chambers claim: the preclusion of a defense witness.*

The prosecution presented a strong case, especially on the second robbery. Omar Leon testified that he was robbed on July 27 and July 31, 1995, at the same location, the parking lot where he worked at the corner of Eighth Avenue and West 29th Street. He did not report the first robbery and had not intended to report the second robbery. The jury may have concluded that a reason for his lack of reporting was that he was an illegal alien at the time. By the time of trial, he had recently married an American citizen and had be-

come a legal resident. (Tr. 158–61.) He testified that, on July 27, Dobbin pushed him into his booth and, when he struggled with Dobbin, an accomplice appeared and brandished a knife. At that point, Dobbin reached into Leon's pockets and took all his cash. Dobbin and his accomplice then hopped onto bicycles and fled.

On July 31, again at about 6:00 p.m., Dobbin reappeared and tried to push Leon into his booth once again. They wrestled, and Dobbin took money from Leon's pockets. Leon used his beeper to strike Dobbin near his left eye. Dobbin then ran to Eighth Avenue, where he turned right and ran north. Leon found a broken wristwatch at the site of their struggle.

At 5:58 p.m., the police received a 911 call from a man who said he had seen a robbery at the parking lot and gave the following description of the robber: a black man, 5'6" tall, wearing a blue and white striped polo top, blue jeans and white tennis shoes. (Tr. 344; the 911 tape and transcript were received as People's Exhibits 8a and 8b.)

Police Officer William Montgomery testified that he responded to a radio call and spotted Dobbin, who matched that description, at approximately 6:06 p.m., on 31st Street two blocks north of the robbery location. He detained Dobbin until police arrived with Leon, who identified Dobbin as the robber. Montgomery arrested Dobbin and found $200 in a pocket. (Leon claimed that about $700 had been taken from him; during the next eight minutes the robber might have handed some of that money to a creditor or to an unseen accomplice.)

Leon's identification was corroborated by several facts. Dobbin's left eye was swollen (apparently where Leon struck him with his beeper), and he had scratches and a bleeding bruise on his neck. (Tr. 42, 50–53; a photo of Dobbin was received as People's Exhibit 5.) Moreover, Montgomery testified that he obtained the broken wristwatch from Leon and mentioned it to Dobbin, who acknowledged that it was his and correctly identified its brand as a "Gitano." (Tr. 47–48.)

Dobbin did not testify. His defense was that Leon had misidentified him. The jury heard only one defense witness, Police Officer Walter Neville. Neville testified that he had interviewed Leon in English, with difficulty, and that he understood Leon to have claimed that he recognized Dobbin, by his voice, as having also robbed him seven months earlier, in December 1994. (Tr. 386, 392–94.) This tended to contradict Leon, who had testified that he was robbed in December 1994 but that he had not told the police that Dobbin was involved in that incident. (Tr. 315–17.)

Dobbin's attorney also sought to have the jury hear Ray Agnew, who would have testified that Dobbin worked for B.A.T. Messenger Service on the same block as Leon's parking lot. If Agnew had testified, Dobbin would then have been able to argue that Leon had misidentified Dobbin through the phenomenon of unconscious transference. Prior to the robberies, Dobbin's features might have become familiar to Leon's unconscious mind, merely because Dobbin had been "walking on that street, where he walked every day, to and from work." (Tr. 366–67.) Leon might have unconsciously transferred some of Dobbin's features to his memory of the black man who robbed him.

Agnew was waiting in the hallway outside the courtroom, and ADA Kollmar had already interviewed him. Nevertheless, she argued at length that Agnew's testimony would be irrelevant and she persuaded Justice Tejada to preclude Agnew from appearing before the jury. (Tr. 366–74.)

On appeal, Mr. Lucente argued as follows:

... The draconian ruling ... violated appellant's right to a fair trial and to call witnesses in his defense. U.S. Const., Amends. VI and XIV ....

"Few rights are more fundamental than that of an accused to present witnesses in his own defense." *Chambers v. Mississippi*, 410 U.S. 284, 302, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973).

(App.294–95.) The Appellate Division's only response to this argument was, "We have considered and rejected defendant's remaining arguments ...."

The state court's decision did not specifically note that any of these "remaining arguments" contained a federal constitutional claim. There is a split in the Circuits as to whether such arguments have been "adjudicated on the merits" within the meaning of 28 U.S.C. § 2254(d). The Second Circuit has decided that the claim was "adjudicated on the merits" unless "the state court opinion suggests reliance upon procedural grounds rather than a determination on the merits." *Sellan v. Kuhlman*, 261 F.3d 303, 314 (2d Cir.2001). But Dobbin's *Chambers* claim ought to be rejected even if it were entitled to *de novo* review. *Washington v. Schriver*, 255 F.3d 45, 56 (2d Cir.2001), reiterated the test for whether a *Chambers* claim rises to the level of a constitutional violation:

> [W]hether the exclusion of [witnesses'] testimony violated [defendant's] right to present a defense depends upon whether "the omitted evidence [evaluated in the context of the entire record] creates a reasonable doubt that did not otherwise exist." In a close case, "additional evidence of relatively minor importance might be sufficient to create a reasonable doubt." On habeas review, trial errors are subject to lenient harmless error review. The creation of otherwise non-existent reasonable doubt satisfies the "substantial and injurious" standard

[of *Brecht v. Abrahamson*, 507 U.S. 619, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993) ].

Upon *de novo* review, I conclude that Agnew's testimony was erroneously precluded but would not have created a reasonable doubt that did not otherwise exist. It would not have overcome the strong evidence that corroborated Leon's identification. The swelling over Dobbin's left eye and the bleeding bruise on his neck were photographed shortly after the robber's struggle with Leon. Leon found the broken wristwatch near the scene of the struggle and gave it to Officer Montgomery, who testified that Dobbin correctly stated the watch's brand name and acknowledged that the watch was his. True, Leon identified Dobbin in a street showup, but this was only minutes after the robbery. The short span of time distinguishes Dobbin's case from the case history cited by Mr. Lucente (App.296–97), which involved an innocent customer who visited an insurance office on two occasions and then was mistakenly identified as a robber when he returned *one month* after a robbery of that office.

Moreover, Agnew's testimony might well have hurt Dobbin's defense. Many messengers use bicycles, and Agnew's testimony that B.A.T. Messenger Service employed Dobbin as a messenger would have given the prosecutor an opportunity to remind the jury that Leon had testified that Dobbin and his accomplice fled the July 27 robbery by hopping on two bicycles.

Accordingly, even upon *de novo* review, I find that Dobbin's *Chambers* claim did not rise to the level of a constitutional violation.

*Ground Three: The Strickland claim: During failed negotiations about a possible guilty plea, Dobbin's trial attorney incorrectly believed that Dobbin was exposed to life imprisonment.*

Until after the trial, Defense Attorney Parker, ADA Kollmar and at least two

judges proceeded on the mistaken assumption that Dobbin, if convicted, would have to be classified as a "mandatory persistent violent felony offender." Dobbin had a 1986 conviction (by plea) for Attempted Robbery in the Second Degree and a 1993 conviction (also by plea) for Attempted Criminal Possession of a Weapon in the Third Degree. In fact, · only the 1986 conviction was a "violent" felony; hence, a conviction of Dobbin on the 1995 indictment would make him only a *second* violent felony offender, with much less exposure than a *persistent* violent felony offender. A person in the latter category would be required to receive, for Robbery in the First Degree, life imprisonment (with parole eligibility to be set for somewhere between 10 years and 25 years). See New York Penal Law §§ 70.00, 70.02, 70.04, 70.06 and 70.08, in the versions in effect as of July 1995.

The "weapon" that was the subject of Dobbin's 1993 possession conviction was a knife, which normally would have been covered by Penal Law § 265.01, Criminal Possession in the Fourth Degree, a class A misdemeanor. However, because Dobbin "ha[d] been previously been convicted of any crime," his 1993 indictment became Criminal Possession of a Weapon in the Third Degree pursuant to § 265.02(1), a class D felony, and his plea bargain to Attempted Criminal Possession was a Class E felony. See Penal Law § 110.05(6). But that particular felony did not qualify as a "violent" felony under Penal Law § 70.02(1)(d).

According to ADA Kollmar, the history of the plea negotiations was as follows (App. 493–96, with my emphasis):

4. At the time of his arrest, defendant refused to provide the police with pedigree information and refused to be fingerprinted. As such, defendant was indicted under the name "John Doe."

5. On August 4, 1995, defendant was fingerprinted.

6. On September 6, 1995, defendant appeared in Supreme Court, Part 50, for arraignment on the indictment. At that time, defendant's criminal record had not been received and defendant's identity continued to be unknown. As such, no offer was made by the People.

7. On November 8, 1995, defendant appeared in Supreme Court, Part 51, defendant's criminal record had been received and defendant's identity was known. It revealed that on March 7, 1986 defendant was convicted on Attempted Robbery in the Second Degree, a violent felony, and on December 2, 1993, defendant was convicted of attempted Criminal Possession of a Weapon in the Third Degree, a violent offense for all but one subdivision of the offense.

Based on defendant's status as a predicate felon, no offer was made [apparently meaning no offer below the "top count"] and the People recommended a sentence of indeterminate term of from *ten years to twenty years* in prison. Judge Andrias, however, ["]corrected["] the People and [erroneously] noted that defendant was a mandatory persistent violent felony offender and as such the minimum sentence [for the top count] was an indeterminate term of *ten years to life* in prison.

8. On January 25, 1996, the People were not ready for trial and offered defendant a plea to *Attempted* Robbery in the First Degree with a promised sentence of an indeterminate term of *eight years to life* in prison. The offer was rejected. The same offer was extended up until the trial began on February 13, 1996.

On February 20, 1996, Mr. Parker, ADA Kollman and Justice Tejada had a long colloquy about the details of the 1993 con-

viction, and the fact that the weapon was a knife. But this was in the context of a *Sandoval* motion and no one noticed that, for sentencing purposes, the 1993 conviction did not constitute a "violent" felony. (2/20/96 Tr. 61–72.)

On February 22, after the jury heard Officer Montgomery's testimony, the following occurred outside the presence of the jury:

> MS. KOLLMAR: I just want on the record, it to be made clear this is the last time the People's offer of *eight to life* is still being held open. The minute Mr. Leon [takes the stand]——
>
> \*   \*   \*   \*   \*   \*
>
> MR. PARKER: I've told that to Mr. Dobbin and I've advised him of that, and he's declined the offer.

(App. 514, Tr. 153, emphasis added.)

Eventually, the jury found that Dobbin had committed a first-degree robbery on July 27, 1995 and a third-degree robbery four days later. On March 21, 1996, Mr. Parker noted for the first time that the 1993 conviction was not a "violent" felony. (App.495.) The sentencing took place on April 17, by which time ADA Kollman and Justice Tejada agreed with Mr. Parker's position. (App.517–21.) Therefore, Dobbin was sentenced, not as a persistent violent felony offender, but only as a second violent felony offender. Justice Tejada imposed a total sentence of 12 to 24 years. (4/17/96 Tr. 23–24.)

As the new attorney for Dobbin, Mr. Lucente filed a brief with the Appellate Division in December 1998. (App.242–300.) Also in December 1998, Judge Chin granted habeas in a case remarkably similar to Dobbin's, *Mask v. McGinnis*, 28 F.Supp.2d 122 (S.D.N.Y.1998).

Apparently unaware of Judge Chin's decision, Dobbin filed a *pro se* motion in March 1999 pursuant to New York Criminal Procedure Law § 440.10(h). (App. 478–92.) He asserted that he had been more knowledgeable than Mr. Parker and had told him from the outset that his 1993 conviction did not count as a "violent" felony, but Mr. Parker failed to see the light until shortly after the trial. Dobbin's version strikes me as unlikely; prior to trial, he complained about Mr. Parker at length before Justice Carol Berkman and Justice Tejada, but he never complained that Mr. Parker was overestimating his sentencing exposure. (2/14/96 Tr. 3–6; 2/20/96 Tr. 2–11.)

However, to prove that his attorney gave inadequate advice, a prisoner need not prove that his attorney was wilfully wrong. It is enough if Dobbin proves that his attorney innocently "failed to recognize defendant's status as a second violent felony offender rather than a persistent violent felony offender," since that would seriously underestimate the client's sentencing exposure. *Mask*, 28 F.Supp.2d at 125.

Mr. Lucente did read Judge Chin's decision, and he supplemented the § 440 motion with two affirmations that clearly explained why Judge Chin's decision was on all fours with Dobbin's *Strickland* claim. (App.502–07, 525–29.)

On August 11, 1999, Justice Tejada denied the § 440 motion. He wrote, "One alleged oversight does not raise this matter to the level of ineffective assistance of counsel." (App.530.) He did not mention Judge Chin's decision.

On September 8, 1999, Mr. Lucente applied to the Appellate Division for leave to appeal the denial of the § 440 motion. His application (App.469–77) explained Judge Chin's decision at length. On September 22, 1999, ADA Tami Aisenson wrote a four-page letter opposing the application (App.457–60); she did not mention Judge Chin's decision.

Meanwhile, on the direct appeal, Dobbin added Point IIII to his *pro se* supplemental brief to the Appellate Division, and explained Judge Chin's decision at length. (App.406–13.)

On October 12, 1999, the Appellate Division chose not to discuss Judge Chin's decision. The last portion of its opinion stated (App.425):

> We have considered and rejected defendant's remaining arguments, including those contained in his *pro se* supplemental brief.
>
> M–5750   *People v. Anthony Dobbin*
>
> Motion seeking leave to appeal the denial of CPL 440.10 motion and other related relief denied.

On November 29, 1999, Mr. Lucente wrote a leave application to Judge Howard A. Levine. (App.426–35.) He closed by saying:

> ... Thus, this leave application constitutes the only chance for the court in this case to resolve the conflict between the courts of this State and the federal district court in the Second Circuit on this issue. *Compare People v. Mack*, 223 A.D.2d 383, 637 N.Y.S.2d 2 (1st Dept.1996) to *Mask v. McGinnis*, 28 F.Supp.2d 122 (S.D.N.Y.1998) appeal pending, United States Court of Appeals for the Second Circuit, Docke[t] No. 99–2071.

On December 30, 1999, Judge Levine denied leave. (App.466.)

On November 15, 2000, the Second Circuit affirmed Judge Chin, *Mask v. McGinnis*, 233 F.3d 132 (2d Cir.2000). On February 23, 2001, Assistant Attorney General Michael J. Keane sent me his opposing brief; pages 17–24 purport to discuss Dobbin's *Strickland* claim, but they never mention *Mask*. In essence, the State has conceded that it cannot distinguish Dobbin's *Strickland* claim from controlling Second Circuit precedent.

Accordingly, I recommend that Judge Berman direct that he or I hold an evidentiary hearing to determine whether, if the parties had known the correct sentencing exposure prior to trial, Dobbin would have received and accepted a plea offer less than his eventual sentence of 12 to 24 years. After holding such a hearing in *Mask*, Judge Chin found that the prosecutor probably would have reduced her stated plea offer (10 years to life) to an offer of 8 to 16 years. In the case at bar, Mr. Lucente argues that ADA Kollman would have reduced her stated plea offer (8 years to life) to an offer of 8 to 16 years. Dobbin alleges that he would have accepted such an offer.

*Ground "Four": The judge's failure to notify counsel before sending the jury an exhibit requested by a jury note.*

Ground "Four" is not raised by Mr. Lucente, but by Dobbin, who included it in his *pro se* supplemental brief to the Appellate Division (App.395–99) and in his 3/18/02 *pro se* supplemental brief to me. During its deliberation, the jury sent a note: "We the jury would like to see the photo of Mr. Leon's neck scratches." (Exh. A3 to 3/18/02 *pro se* Mem.) Apparently, Justice Tejada sent the photo in to the jury. If he gave any advance notice to the attorneys, it is not in the record.

Since the photo was in evidence, the jury had a right to see it. The photo was relevant to the issue of whether the victim had suffered "physical injury," a necessary element of the second-degree robbery charged in the indictment. See Penal Law § 160.10(2)(a). Justice Tejada had discussed this issue at Tr. 567–70, in response to a previous note; Dobbin has no complaint about the handling of the previous note. After viewing the photo, the jurors apparently decided that the

neck scratches were not severe enough to amount to "physical injury." As to the July 31 incident, they found Dobbin guilty of only third-degree robbery. Dobbin has made futile attempts to show that he suffered some sort of prejudice from the judge's failure to notify counsel before sending the exhibit requested by the jury. He wrote to the Appellate Division (at App. 398):

> Defense[,] in the present case, could have asked that the jury be re-instructed on how to assess the evidence . . . .

But Dobbin does not say what sort of re-instruction might have helped him. The simple fact is that Dobbin prevailed on the issue of "physical injury."

The cases cited by Dobbin were thoroughly discussed in a recent opinion by Judge Marrero, *United States v. Mejia*, 200 F.Supp.2d 322 (S.D.N.Y.2002). At footnote 3, Judge Marrero wrote: "A deprivation of a defendant's right to be present is analyzed under the harmless error standard [even in a federal trial] . . . ." In Mejia's trial, as in Dobbin's trial, "the jury's note was not tantamount [to] a request for clarification of questions of law or for further substantive instructions." 2002 WL at 330. And the defense did not lose "a real opportunity to convince the Court that some other or different response would have been more appropriate." *Id.* at 332. Justice Tejada's action was utterly different from the action of the state court judge in *Krische v. Smith*, 662 F.2d 177 (2d Cir.1981), who received a note that the jury was deadlocked and sent a court officer to the jury room to instruct the jury to continue deliberations because "it's not soon enough." *Id.* at 178.

Accordingly, I find that Ground "Four" lacks substance.

*CONCLUSION AND RECOMMENDATION*

I recommend that Judge Berman direct that he or I hold an evidentiary hearing to determine whether ADA Kollmar had a racially discriminatory intent when she struck the prospective juror. I also recommend that Judge Berman direct that he or I hold an evidentiary hearing to determine whether, if the parties had known the correct sentencing exposure prior to trial, Dobbin would have received and accepted a plea offer less than his eventual sentence of 12 to 24 years.

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, any party may object to this recommendation within 10 business days after being served with a copy, by filing written objections with the Clerk of the U.S. District Court and mailing copies (a) to the opposing party, (b) to the Hon. Richard M. Berman, U.S.D.J. at Room 201, 40 Centre Street, New York, N.Y. 10007 and (c) to me at Room 1360, 500 Pearl Street. Failure to file objections within 10 business days will preclude appellate review. *Thomas v. Arn*, 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Wesolek v. Canadair Ltd.*, 838 F.2d 55, 58 (2d Cir.1988). Any request for an extension of time must be addressed to the District Judge.